## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

UNITED STATES OF AMERICA )
)
)
v. )  CR: 4:21-70
)
)
BYRON BOOKER )
)

## PLEA AGREEMENT

Defendant Byron Booker, represented by his counsel A. J. Balbo, Esq., and Teri Lee Thompson, Esq., and the United States of America, represented by Assistant United States Attorney Jennifer G. Solari and Special Assistant United States Attorney Darron J. Hubbard, have reached a plea agreement in this case. The terms and conditions of that agreement are as follows.

1.    Guilty Plea

Defendant agrees to enter a plea of guilty to Count Five of the Superseding Indictment, which charges a violation of 18 U.S.C. § 1114 (Premeditated Murder of a Member of the United States Uniformed Services).

This document sets forth the terms of a proposed plea agreement between the defendant, Byron Booker, and the United States Attorney's Office for the Southern District of Georgia. This is a conditional offer and neither the terms of this proposed plea agreement nor the defendant's offer to plead guilty are admissible in any later proceedings, under Fed. R. Crim. P. § 11(f) and Fed. R. Ev. § 410, unless accepted by the Department of Justice. If and when this agreement is accepted and ratified by

the Department of Justice and the United States Attorney's Office for the Southern District of Georgia, the waiver set forth in paragraph 9d., *infra*, shall take effect.

2.    Elements and Factual Basis

The elements necessary to prove the offense charged in **Count Five** are:

(1) The defendant unlawfully killed SPC Austin J. Hawk;

(2) the defendant killed SPC Hawk with malice aforethought;

(3) the killing was premeditated;

(4) the killing was on account of SPC Hawk's performance of his official duties;

(5) the killing took place within the special territorial jurisdiction of the United States, that is, Fort Stewart Military Reservation; and

(6) the victim, SPC Hawk, was an employee and member of the United States Uniformed Services.

Defendant agrees that he is, in fact, guilty of the offense alleged in Count Five of the Superseding Indictment. He agrees to the accuracy of the facts set forth in Appendix A to this agreement. Defendant agrees the government would have proven the facts therein beyond a reasonable doubt at any trial on the merits.

3.    Possible Sentence

Defendant's guilty plea will subject him to the following possible sentence:

**Count Five:** Defendant's guilty plea will subject him to a mandatory minimum sentence of life imprisonment, not more than 5 years' supervised release, not more than a $250,000 fine, and such restitution as may be ordered by the Court.

2

Defendant's initials

It is the intent and understanding of the parties that, should parole be reinstated in the federal judicial system, the defendant shall be ineligible. The Court additionally must impose a $100 special assessment per count of conviction.

4.      No Promised Sentence

No one has promised Defendant that the Court will impose any particular sentence or a sentence within any particular range. The Court is not bound by any estimate of sentence given or recommendations made by Defendant's counsel, the government, the U.S. Probation Office, or anyone else. The Court may impose a sentence up to the statutory maximum. Defendant will not be allowed to withdraw his plea of guilty if he receives a more severe sentence than he expects.

The Court is obligated to use the United States Sentencing Guidelines to calculate the applicable guideline range for Defendant's offense. The Sentencing Guidelines are advisory; the Court is not required to impose a sentence within the range those Guidelines suggest. The Court will consider that range, possible departures under the Sentencing Guidelines, and other sentencing factors under 18 U.S.C. § 3553(a), in determining the Defendant's sentence. The Sentencing Guidelines are based on all of Defendant's relevant conduct, pursuant to U.S.S.G. § 1B1.3, not just the conduct underlying the particular Count or Counts to which Defendant is pleading guilty.

Defendant's initials _BB_

5.    Agreements Regarding Sentencing Guidelines

   a.    Use of Information

Nothing in this agreement precludes the government from providing full and accurate information to the Court and U.S. Probation Office for use in calculating the applicable Sentencing Guidelines range. Any incriminating information provided by the defendant during his cooperation will not be used in determining the applicable Guidelines range, pursuant to Section 1B1.8 of the Sentencing Guidelines.

   b.    Acceptance of Responsibility

If the Court determines that Defendant qualifies for an adjustment under U.S.S.G. § 3E1.1(a), and the offense level prior to operation of § 3E1.1(a) is 16 or greater, the government will move for an additional one-level reduction in offense level pursuant to Section 3E1.1(b) based on Defendant's timely notification of his intention to enter a guilty plea.

6.    Dismissal of Other Counts

At sentencing, the government will move to dismiss any other Counts of the Indictment and Superseding Indictment that remain pending against Defendant.

7.    Abandonment of Property

Defendant waives and abandons his interest in any property that has been seized in connection with this case.

Defendant's initials _DB_

8.   Financial Obligations and Agreements

   a.   Restitution

The amount of restitution ordered by the Court shall include restitution for the full loss caused by Defendant's total criminal conduct. Restitution is not limited to the specific counts to which Defendant is pleading guilty. Any restitution judgment is intended to and will survive Defendant, notwithstanding the abatement of any underlying criminal conviction.

   b.   Special Assessment

Defendant agrees to pay a special assessment in the amount of $200, payable to the Clerk of the United States District Court, which shall be due immediately at the time of sentencing.

   c.   Enforcement

Any payment schedule imposed by the Court is without prejudice to the United States to take all actions and remedies available to it to collect the full amount of the financial obligations imposed by the judgment of the Court in this case. Defendant understands and agrees that the financial obligations *[and forfeiture]* imposed by the judgment of the Court in this case will be placed on the Treasury Offset Program so that any federal payment that Defendant receives may be offset and applied to the judgment debt without regard to or affecting any payment schedule imposed by the Court.

5

Defendant's initials *BD*

9. <u>Waivers</u>

    a.    <u>Waiver of Appeal</u>

Defendant entirely waives his right to a direct appeal of his conviction and sentence on any ground (including any argument that the statute to which the defendant is pleading guilty is unconstitutional or that the admitted conduct does not fall within the scope of the statute). The only exceptions are that the Defendant may file a direct appeal of his sentence if (1) the court enters a sentence above the statutory maximum, (2) the court enters a sentence above the advisory Sentencing Guidelines range found to apply by the court at sentencing; or (3) the Government appeals the sentence. Absent those exceptions, Defendant explicitly and irrevocably instructs his attorney not to file an appeal.

    b.    <u>Waiver of Collateral Attack</u>

Defendant entirely waives his right to collaterally attack his conviction and sentence on any ground and by any method, including but not limited to a 28 U.S.C. § 2255 motion. The only exception is that Defendant may collaterally attack his conviction and sentence based on a claim of ineffective assistance of counsel.

    c.    <u>FOIA and Privacy Act Waiver</u>

Defendant waives all rights, whether asserted directly or through a representative, to request or receive from any department or agency of the United States any record pertaining to the investigation or prosecution of this case under the authority of the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a, and all subsequent amendments thereto.

Defendant's initials $\mathcal{BB}$

d.      <u>Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410 Waiver</u>

Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence ordinarily limit the admissibility of statements made by a defendant during the course of plea discussions or plea proceedings. Defendant knowingly and voluntarily waives the protections of these rules. If Defendant fails to plead guilty, or his plea of guilty is later withdrawn, all of Defendant's statements in connection with this plea, and any leads derived therefrom, shall be admissible for any and all purposes.

10.    <u>Defendant's Rights</u>

Defendant has the right to be represented by counsel, and if necessary have the court appoint counsel, at trial and at every other critical stage of the proceeding. Defendant possesses a number of rights which he will waive by pleading guilty, including: the right to plead not guilty, or having already so pleaded, to persist in that plea; the right to a jury trial; and the right at trial to confront and cross-examine adverse witnesses, to be protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses.

11.    <u>Satisfaction with Counsel</u>

Defendant has had the benefit of legal counsel in negotiating this agreement. Defendant believes that his attorney has represented him faithfully, skillfully, and diligently, and he is completely satisfied with the legal advice given and the work performed by his attorney.

7

Defendant's initials _BB_

12. Breach of Plea Agreement

Once this offer to plead is accepted and ratified in full, if Defendant fails to plead guilty, withdraws or attempts to withdraw his guilty plea, commits any new criminal conduct following the execution of this agreement, or otherwise breaches this agreement, the government is released from all of its agreements regarding Defendant's sentence, including any agreements regarding the calculation of Defendant's advisory Sentencing Guidelines. In addition, the government may declare the plea agreement null and void, reinstate any counts that may have been dismissed pursuant to the plea agreement, and/or file new charges against Defendant that might otherwise be barred by this plea agreement. Defendant waives any statute-of-limitations or speedy trial defense to prosecutions reinstated or commenced under this paragraph.

13. Entire Agreement

This agreement contains the entire agreement between the government and Defendant.

DAVID H. ESTES
UNITED STATES ATTORNEY

10/24/22
Date

Patricia Rhodes
Chief, Criminal Division

10/24/22
Date

Jennifer G. Solari
Assistant United States Attorney

8

Defendant's initials _BB_

_____                    _Darron T Hubbard_
Date                               Darron J. Hubbard
                                   Special Assistant United States Attorney

9                                          Defendant's initials _BB_

I have read and carefully reviewed this agreement with my attorney. I understand each provision of this agreement, and I voluntarily agree to it. I hereby stipulate that the factual basis set out therein is true and accurate in every respect.

10/8/2022
Date

Byron M. Booker, Defendant

I have fully explained to Defendant all of his rights, and I have carefully reviewed each and every part of this agreement with him. I believe that he fully and completely understands it, and that his decision to enter into this agreement is an informed, intelligent, and voluntary one.

10/8/2021
Date

A. J. Balbo, Defendant's Attorney

10/8/2022
Date

Teri Lee Thompson, Defendant's Attorney

Defendant's initials 

In 2019 through June 2020, Jordan Brown and SPC Austin J. Hawk were serving terms of active duty in the United States Army at Fort Stewart Military Reservation (FSGA), which is within the special territorial jurisdiction of the United States. Specialist Hawk ("Hawk") was assigned to the 92nd Chemical Company on Fort Stewart, Georgia. Brown, then a Specialist, was also assigned to the 92nd Chemical Company. Defendant BYRON BOOKER ("BOOKER"), a friend of Brown's, completed a term of active duty at FSGA on May 8, 2020, and was Honorably Discharged as an E-5 (Sergeant) from the same Company.

On May 2, 2020, SPC Hawk made a verbal report to his immediate superior about his belief that Brown and Defendant BOOKER had been smoking marijuana. Hawk was required by Army Regulation 600-20 to make such a report, as he had been elevated to the position of squad leader and drug use is a criminal offense under the Uniform Code of Military Justice, Article 112a. Brown learned of the report almost immediately and attempted to confront Hawk by calling him and visiting Hawk's barracks room. Hawk did not answer the phone and refused to open his barracks room door. Hawk told Brown through the door that he did not want to talk about it and warned Brown not to touch his vehicle.

Upon learning of Hawk's report of suspected drug use, as well as a similar report made by another Soldier, the Commanding Officer of 83rd CBRN Battalion (hereinafter "the Commander") initiated an official proceeding - a Commander's Preliminary Inquiry - as required by Rule for Courts-Martial (RCM) 303. The

1

Executive Officer of 83rd CBRN Battalion, appointed by the Commander to act as the RCM 303 Investigating Officer, asked SPC Hawk and the other Soldier to provide signed, sworn statements restating their allegations. On May 4, 2020, Hawk and the other Soldier did so. Based on the information in those reports, the Commander ordered Brown to submit to urinalysis on May 5, 2020.

On June 2, 2020, the Commander notified Brown in writing that his urine tested positive for THC and that the Army was initiating involuntary separation proceedings against him under Chapter 14-12c of Army Regulation 635-200 (Commission of a Serious Offense). Later the same day, Brown notified Defendant BOOKER and a few other friends via text message that he was being "chaptered" out of the Army. Brown was angry at Hawk, as he believed Hawk had cost him his position in the Army, his paycheck, his housing, and possibly his relationship with his father.

By the time Brown learned he was being involuntarily separated from the Army, Defendant BOOKER had relocated temporarily to Wyoming for a civilian job. Because of Defendant BOOKER's poor work performance, his employer dismissed him from the job site and did not assign him any further work. With no reason to remain in Wyoming, Defendant BOOKER returned to his rented home in Ludowici, Georgia, on June 13, 2020.

On June 13, 2020, Brown spoke to Defendant BOOKER on the phone twice: once from 6:00 p.m. until 7:39 p.m., and again from 8:57 p.m. until 9:42 p.m. During those conversations, Defendant BOOKER and Brown agreed something should be

BB

done to SPC Hawk because SPC Hawk was a "snitch." The pair discussed beating Hawk up, damaging his car, or breaking things in Hawk's barracks room. During one or both of the June 13 conversations, however, Defendant BOOKER suggested a plan to "silence" Hawk for reporting Brown's drug use. Defendant BOOKER suggested that Brown, while serving as the "staff duty" runner on June 14-15, remove a barracks master key from a key box and surreptitiously provide it to Defendant BOOKER. The staff duty is an Army assignment wherein Soldiers on duty are responsible for good order, discipline, and security of the unit area as well as acting as the representative of the command after normal duty hours. According to the plan, Defendant BOOKER would travel a short distance to Hawk's barracks room, use the master key to enter, "silence" Hawk, and then return the key to Brown before anyone knew it was missing. Brown told Defendant BOOKER that Army CID investigators would figure it out, but Defendant BOOKER replied, "Wh]o's gonna find out? It's gonna be 4 in the morning – dark – ain't nobody up; ain't nobody gonna be outside; no one's gonna find out," or words to that effect. Defendant BOOKER further assured Brown, "They aren't gonna have anything. We don't even know if they can check the locks. They're not gonna find anything."

Brown understood during the conversations on June 13, 2020 about "silencing" SPC Hawk that Defendant BOOKER intended to kill Hawk in retaliation for Hawk's report of suspected drug use. But Brown told Defendant BOOKER that killing Hawk was too much because "the punishment should fit the crime." According to a recorded law enforcement interview of Brown, Brown suggested BOOKER do something less

BB

like beat Hawk up, either in Hawk's barracks room or in public. Defendant BOOKER replied, however, that Hawk deserved to be "silenced" for snitching. Brown told Defendant BOOKER again that murdering Hawk was too much and, according to Brown's recorded law enforcement interview, Brown suggested instead that BOOKER break SPC Hawk's jaw to send a message about snitching.

On June 14, 2022, Brown reported to Staff Duty at approximately 8:45 a.m. He was on duty with a Noncommissioned Officer (NCO) and a commissioned officer (Staff Duty Officer or SDO). The duty NCO working with Brown on June 14-15, however, always kept the master keys on her person. Thus, Brown was not able to gain control of them.

Brown called Defendant BOOKER at 10:20 a.m. on June 14, 2020 and spoke to him for 9 minutes and 46 seconds. At 3:23 p.m., Defendant BOOKER called Brown and his call was routed to Brown' voicemail. Brown texted, "Can't talk, text me." Defendant BOOKER responded, "When you gonna be free?" Brown replied, "Probably not 'til my dinner break." At 3:42 p.m., Brown called Defendant BOOKER and spoke to him for 9 minutes and 41 seconds.

From 2:10 a.m. until approximately 3:40 a.m. on June 15, 2020, Brown spoke to his girlfriend who resided in Arizona. After learning Brown would be involuntarily separated from the Army, Brown's girlfriend told him the relationship would not work and she wished to end it. After speaking with his stepmother and his sister about it, Brown texted Defendant BOOKER, "you up?" Defendant BOOKER replied that he was, and the two spoke on the phone from 8:38 a.m. until 8:51 a.m. During that

4

conversation, Brown told Defendant BOOKER, among other things, that Hawk had ruined his life and taken everything from him, including his girlfriend.

Brown exchanged several text messages and phone calls with Defendant BOOKER on June 15, 2020. At approximately 4:25 p.m., Defendant BOOKER arrived at the Fort Stewart Security Office in his vehicle and obtained a Visitor's Pass, claiming he had to settle a charge from the Central Issuing Facility (CIF). Instead, Defendant BOOKER went to the barracks and picked up Brown.

From approximately 5:00 p.m. until 8:20 p.m. on June 15, Defendant BOOKER and Brown spent time in Defendant BOOKER's vehicle, smoking marijuana and visiting various locations like a McDonald's drive-thru. The pair discussed "life and existentialism; almost like things don't matter and you can do anything." Brown denied any ability to recall the rest of the conversation, saying he had smoked too much marijuana. Defendant BOOKER returned Brown to the barracks at about 8:20 p.m., at which time Brown went to sleep.

On June 16, 2020, Brown went to CIF on Fort Stewart as part of the involuntary separation process. Brown spoke to Defendant BOOKER by phone three times between 9:21 a.m. and 12:17 p.m. on June 16. The call at 12:17 p.m. lasted eight minutes. At 12:46 p.m., Defendant BOOKER texted friends, "Yo i gotta go on post for some dumb shit. Ill be back in about an hour." Defendant BOOKER entered Fort Stewart and drove directly to the area at or near the CIF, arriving at about 1:07 p.m. and departing at about 1:09 p.m. Brown was in or near the parking lot of CIF during that time, waiting for another Soldier who was inside. At 1:20 p.m., Brown

5

texted a friend, "we leavin," and departed CIF with another Soldier. Defendant BOOKER did not visit any other location on Fort Stewart on June 16, nor did he enter the CIF. The government has not discerned the purpose for what appears to have been a brief meeting between the two.

At approximately 12:22 a.m. on June 17, 2020, Defendant BOOKER parked his vehicle in a dirt lot outside Fort Stewart's Gate 7, which was unmanned and blocked to vehicular traffic at that hour. Defendant BOOKER, whose Visitor's Pass had expired only 22 minutes earlier, unlawfully entered Gate 7 by walking around the concrete barriers at the commercial vehicle entrance. Defendant BOOKER continued on foot approximately one mile to the barracks building, climbed the stairs to the second floor, and gained access to Hawk's individual room. Defendant BOOKER knew Hawk would be alone in his room at that hour because Brown told him Hawk's roommate had recently moved out. Based upon electronic lock records for Hawk's room, it appears Defendant BOOKER somehow caused Hawk to open his door from the inside.

Once inside Hawk's room, Defendant BOOKER slashed and stabbed Hawk repeatedly with a sharp-edged weapon. Defendant BOOKER and Hawk moved around the room as the attack went on, causing so much noise that the occupant of the barracks room directly below —Brown — heard prolonged noises "like furniture moving." Brown told investigators, however, that he simply thought Hawk was exercising or moving furniture. At the conclusion of the attack, Defendant BOOKER,

then bleeding from an accidental cut on his right hand, left Hawk's room and returned to Gate 7 the way he came, exiting at approximately 1:09 a.m.

A medical examiner who performed Hawk's autopsy identified 40 separate stab or slash wounds, including stab wounds to Hawk's lungs, kidney, and brain, as well as a 3-inch gash across Hawk's throat that severed his jugular vein and carotid artery. The throat wound was not survivable.

FBI agents and Richmond Hill Police Officers located Defendant BOOKER behind a shopping plaza in Richmond Hill, Georgia, in the early morning hours of June 18, 2020. Defendant BOOKER was arrested without incident. The FBI arrested Jordan Brown on April 12, 2021, following his indictment by the grand jury.

